**Charles N. BATES and Debra Dunfee Bates, Plaintiffs,**

v.

**CITY OF FORT WAYNE, INDIANA, et al., Defendants.**

Nos. F 79–173, F 79–175.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 19, 1983.

Robert D. Colestock, Fort Wayne, Ind., for plaintiffs.

Gary J. Rickner and James P. Fenton, Barrett, Barrett & McNagny, Fort Wayne, Ind., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The case deals with alleged violations of the Fourth and Fourteenth Amendments to the Constitution, and 42 U.S.C. § 1983. This court, having considered the entire record and being duly advised, hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

The plaintiffs in this cause are Charles Nathaniel Bates and Debra Dunfee Bates. The defendants are police officers Kenneth Buckmaster, Ron Buskirk, Alan Marquardt, Kim Spielman, Kenneth Gigli, and the City of Fort Wayne, Indiana. Mr. Bates has a long criminal history, dating back to 1959. Mr. Bates, at the time of trial, had two felony convictions. Mr. Bates' reputation in the Fort Wayne community, as perceived by the police officers, was that of being the biggest drug dealer in the Fort Wayne community and being a violent individual. Defendants Buckmas-

ter, Buskirk, Marquardt, Spielman, and Gigli are all police officers with the Fort Wayne Police Department. Defendant City of Fort Wayne employs said defendants as police officers.

Mr. Bates owns a structure in Fort Wayne located at 818–822 East Pontiac Street. The structure appears from the outside to be all one structure. In fact, the structure inside is separated in such a way as to create five separate areas. The structure is a two story wood frame house with a basement and with a connecting overpass to a two story concrete block structure.

At the time of the events in question, Mr. and Mrs. Bates resided in the second floor area of the concrete block structure, denominated by them as 822 East Pontiac. The basement of the structure involved was also known as The Underground, was being rented to Robert Rowles, and was denominated by Bates as 820 East Pontiac Street. The second floor apartment in the part of the structure which is the frame house was being rented as an apartment to Mary Beal and was denominated by Bates as 820½ East Pontiac Street. The first floor of the wood frame portion of the entire structure was also an apartment, rented to Carl Griffin, and was denominated by Bates as 818 East Pontiac Street. Finally, the first floor of the concrete block portion of the structure contained four so-called sleeping rooms with a communal bathroom. This portion of the structure was denominated by Bates as 822½ East Pontiac Street.

The structure has many doors. Several of the doors had mail boxes placed beside them and numbers placed above the doors, matching the denominations placed on the various portions of the structure by Mr. Bates. The only house number visible from the street was 820 and it was the only number the investigating police officers saw. The police officers did not know the seemingly one structure contained five separate living areas, none of which are apparently accessible except by using an outside entrance. The police officers involved had never been inside the structure to know

that the structure had been compartmentalized into five separate areas. Police officers attempted to verify the correct legal address of Mr. Bates and of the structure. City utilities informed the officers that the water bill, the only bill city utilities had, showed the address as 820 East Pontiac. The police officers at the time of these events, believed that the address of 820 East Pontiac was the legal address of the entire complex. It was not until the September 1, 1979 search pursuant to a search warrant that the defendant officers became aware that there was more than one address assigned to the structure by Bates and that the structure was compartmentalized into totally separate areas. In all events, the police officers believed, based on Mr. Bates' residing in the structure and his apparent ownership of same, that Mr. Bates had control of the entire structure and used it as one unit.

This case centers around two events, one occurring in the early morning hours of September 1, 1979 and one occurring in the early afternoon of September 4, 1979. A search occurred pursuant to a search warrant on September 1, 1979. A warrantless search of the Bates apartment occurred September 4, 1979. It was also on September 4, 1979 that a warrantless arrest of Charles Bates was made on the preliminary charge of criminal confinement of one Tammy Chipman.

Defendants Marquardt and Spielman were the police officers investigating various events which led to the search of September 1, 1979 and the search and arrest of September 4, 1979. Officer Buckmaster's role was that of an observer on the scene during the September 1, 1979 search. Officer Buskirk read the search warrant to plaintiff on September 1, 1979 and had Mr. Bates in his presence during the September 1 search. Officer Gigli was the officer who arrested Bates on September 4, 1979.

In late August of 1979, a person by the name of James Holliness contacted the Vice and Narcotics Department of the Fort Police Department, stating that it was his belief that his girlfriend, Tammy Chipman,

was being held against her will and heroin was being forced upon her by Carl Griffin and Mr. Bates. (Carl Griffin resided in the complex owned by Mr. Bates, located at 820 East Pontiac Street.) The police department told Mr. Holliness that Mr. Holliness should wait a little bit, but that if he still felt Ms. Chipman was being held against her will by Mr. Bates and Mr. Griffin that Mr. Holliness should re-contact the police department and they would assist him. Mr. Holliness did contact the police department again. However, Ms. Chipman was no longer with Mr. Bates and Mr. Griffin, but was with Mr. Holliness. Officers Marquardt and Spielman went to meet with Mr. Holliness and Ms. Chipman.

Ms. Chipman related the story that she had been held against her will and heroin had been forced upon her. She was upset about the incident and she stated she wished to assist the police in apprehending Mr. Bates. It is apparently a common street practice to cultivate new drug business by forcing heroin upon someone, thereby causing that person to become an addict. At that same meeting, Ms. Chipman indicated various houses in Fort Wayne to the police officers as houses where drugs and other narcotics were being sold. Those houses Ms. Chipman pointed out to the officers were houses the police officers had long suspected were houses where drugs and narcotics were sold.

On August 30, 1979, Ms. Chipman was picked up at her place of employment and taken to a vacant lot in an undercover van. A female police officer conducted a strip search of Ms. Chipman. Ms. Chipman was given $50 and driven to a spot a short distance from Mr. Bates' home at 820 East Pontiac Street. Ms. Chipman was strip searched at 9:00 p.m. At 9:05 p.m. she left the undercover van and walked toward the Bates residence. The van was parked on Weisser Park Avenue. Another police vehicle was stationed on Pontiac Street such that the police officer within had a view of several of the various doors leading into the complex located at 820 East Pontiac

Street. At 9:15 p.m., Ms. Chipman returned to the undercover van parked on Weisser Park Avenue and gave the officers a tinfoil packet which contained a brownish-white substance which was believed at that time to be heroin. Ms. Chipman returned $10 of the $50 she had received from the officers. Ms. Chipman stated that she had bought the substance in the tinfoil packet from Nathaniel Bates and that Bates told her he had five grams of heroin and that she should come back and buy more. The officers took Ms. Chipman to another place where a female officer again strip searched the subject. That strip search occurred at 9:20 p.m. on August 30, 1979. The tinfoil packet was marked and tagged and placed in a locked security box prior to its testing by the Fort Wayne Police Department lab. An analysis of the foil packet revealed that the substance within was heroin and had an aggregate weight of .23 grams.

The next day, August 31, 1979, another controlled buy was set up by the police officers. Ms. Chipman was picked up at 12:50 p.m. by the officers. She was again strip searched by a female officer which occurred at 1:05 p.m. She was given $70 and taken to the same drop-off point as used the previous day on Weisser Park Avenue. Ms. Chipman walked in the direction of the Bates residence and the undercover police officer stationed on Pontiac Street testified that she did go into the Bates complex. Ms. Chipman returned to the undercover van on Weisser Park Avenue at approximately 1:45 p.m., carrying with her a foil packet containing a brown powdery substance which she related had been sold to her by Mr. Bates. She further related Mr. Bates informed her that the substance was heroin, was very good and he had several more grams of it. Mr. Bates also showed Ms. Chipman a white powdery substance which he claimed was cocaine.

Chipman stated she would sign a search warrant. Chipman was strip searched by a female police officer at approximately 2:00 p.m. at police headquarters. She returned to the officers $20.00 in change. The packet containing the brown powdery substance sold to Chipman by Bates was turned over to Officer Marquardt who carried the packet to the Fort Wayne Police Department lab. Subsequent analysis by the lab showed the substance to be heroin of good quality with an aggregate weight of .28 grams.

Officer Spielman swore out the following "Affidavit for Search Warrant" on August 31, 1979:

> "STATE OF INDIANA )
> ) SS:
> COUNTY OF ALLEN )

### AFFIDAVIT FOR SEARCH WARRANT

Undersigned Affiant swears upon oath that he believes and has good cause to believe that Charles Nathaniel Bates had, on August 31, 1979, certain Narcotic Drugs, to wit: Heroin, and Cocaine concealed in or about the following described premises:

a white, two (2) story, wood frame apartment house, said Heroin is in an apartment, located on the second floor of the building and the basement, which is used to sell alcoholic beverages. Said building is commonly known as 820 E. Pontiac Street,

situated in the County of Allen, State of Indiana.

That Affiant bases his belief and cause for belief on the fact that on Aug. 30, 1979, a confidential informant, whose anonymity is paramount [sic] to the State of Indiana for the protection of the witness, went to bates [sic] apartment and purchased .23 grams of Heroin. Prior to the buy, and immediately afterward, a strip search was conducted on the informant. On August 31, 1979, the confidential informant again made a controlled buy of Heroin. Lab. tests indicate the Heroin is a good quality and the second buy weighed .28 grams.

During the time the informant was making the second buy, Bates stated that he had over two (2) more grams of Heroin and Cocaine. Bates, at that time, showed the informant the Cocaine.

Det. Spielman states he believes the aforesaid confidential informant is a credible and reliable person who spoke with personal knowledge of the aforesaid information. The said credibility and reliability is based upon the fact that said informant has made two (2) controlled buys of Heroin after informing Narcotics Officers that Bates was selling drugs."

It was a policy that no warrants were sought unless there had been two controlled buys. Two buys were required because the first showed the propensity of the individual to sell drugs. The second confirmed the reliability of the informant.

Said affidavit was subscribed and sworn to before a Deputy Prosecuting Attorney. The affidavit was then taken to the Honorable Philip R. Thieme. Judge Thieme issued a search warrant. Ms. Chipman was available for questioning by Judge Thieme if Judge Thieme had wished. The police officers gave Ms. Chipman $250.00 and told her to leave town. They observed her give $150.00 to Mr. Holliness.

The Fort Wayne Police executed the search warrant at 5:00 a.m. September 1, 1979. The entrance into the second story of the 820 East Pontiac complex which Mr. Bates denominated 822 East Pontiac consists of two doors, both operating on buzzers activated from inside the second story. The outer door was steel, apparently an old jail cell door backed with steel. The inner door was also steel. The police placed an exploding charge on the steel door prior to knocking and requesting entry into the complex. There is a danger with drug-related searches that evidence will be disposed of by flushing it down the toilet while entry by police is being effected. The police knocked and requested entry, but upon receiving no immediate response and upon simultaneously observing Mr. Bates in the bathroom, the police detonated the explosive charge on the outer door and entered the complex.

Mr. Bates opened the second door for the police. Police secured the complex area. Officer Buskirk read the search warrant to Mr. Bates at 5:05 a.m. September 1, 1979.

The complex was then searched; Mr. Bates remained at the scene during the entire search. A thorough search was made of the complex although nothing was disturbed or destroyed except insofar as necessary to determine if drugs or other illegal items were stored underneath or within items or fixtures located in the structure. No eating occurred nor untoward remarks made nor Mr. Bates exposed to his children; Mrs. Bates and Mr. Bates' children were unharmed and unmolested by the police officers. Mr. Bates was not harmed nor threatened in any way.

The search revealed many items. In particular, the search of Mr. Bates' immediate living area uncovered a bag containing large amounts of I.D.s, credit cards, driver's licenses not belonging to members of the Bates household, a bag containing a white, powdery substance, a bag containing a brown, powdery substance, and a Pepperidge Farm cookies bag containing rolled currency, appearing to be rolled in $1,000.00 lots. When counted, there was $6,990.00 in the cookie bag. That money plus $781.31, rolled in $100.00 lots also found in the Bates living area was turned over to the Internal Revenue Service to be credited to an outstanding tax lien against Mr. Bates of $44,854.68. Mr. Bates was arrested on eight preliminary counts. Several other people found in the complex were arrested on various charges, some of which resulted in convictions for those people. Mr. Bates' bond on all counts was $31,000.00. Mr. Bates posted bond and was released from custody.

On the evening of August 31, 1979, the police had received a phone call from Mr. Holliness, who stated he could not find Ms. Chipman. On the morning of September 4, 1979, Mr. Holliness again contacted the police, stating that he knew a man who had seen Ms. Chipman being taken into the Bates complex on the evening of September 3, 1979. She was accompanied by Mr. Bates and a Mr. Griffin. The police officers told Mr. Holliness to produce the man who allegedly saw these events and bring the man to the police for questioning.

At approximately noon on September 4 Mr. Holliness brought Willie James Washington to the police. They questioned Washington; Washington made a verbal statement that he saw Ms. Chipman, who knew him, standing with Mr. Bates and Mr. Griffin in front of a barber shop near the Bates complex for at least five minutes and that, although she could clearly see Mr. Washington, she did not speak to him. Mr. Washington stated Ms. Chipman would have spoken to him if everything was all right. Mr. Washington did not say he saw Ms. Chipman taken into any buildings by Mr. Bates and Mr. Griffin. Mr. Washington gave a taped statement after the search and arrest of September 4, 1979. The tape was quite a bit weaker than the verbal statement given originally. In the taped statement, Mr. Washington said he could not say that Mr. Bates and Mr. Griffin were holding Ms. Chipman against her will.

The police checked Mr. Washington's police record and found he had no record. At the time of Mr. Holliness' call on the morning of September 4, 1979, the police thought Ms. Chipman had left town as instructed. It was after the telephone call on the morning of September 4, 1979 the police officers became alarmed. Mr. Washington rode with the police officers and pointed out the Bates complex to the officers. The officers believed an emergency situation existed.

The officers based their belief on the facts that Mr. Bates had a long criminal history and a reputation as a violent man and that a situation where a drug informant is seen with the person the informant set up for a controlled buy or buys is inherently dangerous to the informant and hence, an emergency. The officers had also learned that Mr. Bates had allegedly put a contract out on Ms. Chipman's life immediately after the September 1, 1979 search in the amount of $10,000.00. The officers had also been told by another police officer on the morning of September 1, 1979, following the search of Bates' residence, that at least a portion of the marked buy money given to and used by Tammy

Chipman to make the controlled buys from Bates on August 30 and 31 was found among the money discovered rolled up in a cookie sack which was confiscated from the closet in Bates' bedroom. The officers believed that Chipman had made the controlled buys from Bates, that she had been seen with Bates, that Bates knew she was the informant and was proceeding in accordance with his reputation, and that, consequently, Ms. Chipman's life was in danger.

The officers went to both the Prosecutor's Office and Judge Thieme's office, attempting to secure a search warrant for the person of Tammy Chipman. In both instances, they were informed a search warrant could not be issued for a live person. However, they were also informed that there was nothing against the law in acting to protect the lives of citizens and that if they had probable cause to believe there was someone in immediate danger of bodily harm, then that would be sufficient to act under any circumstances. Judge Thieme told them if an emergency existed, the police officers must act to alleviate the emergency if they could. The police officers relied on Judge Thieme's and the Prosecutor's Office's representations as to their legal obligations and duties regarding both the possible victim and the possible suspect.

The officers went to the Bates complex, specifically to the Bates living area, in the early afternoon of September 4, 1979. They knocked, entered the apartment, and searched for the person of Tammy Chipman. They searched only for her and upon seeing she was not there, the police officers exited the apartment. They did not eat or drink or harm or threaten Mrs. Bates, who was in the apartment. Upon exiting the complex, Mr. Bates arrived and Officer Gigli arrested him on a preliminary charge of criminal confinement of Tammy Chipman.

On September 5, 1979 Tammy Chipman contacted the police. She informed them she had been staying at a motel in New

Haven, Indiana since August 31, 1979. She further stated she had not been confined during that August 31—September 5 period by Mr. Bates. The police dropped the preliminary charge against Mr. Bates. Mr. Bates was bound over for trial on counts arising out of the two controlled buys Ms. Chipman made. Those charges were also eventually dismissed because Ms. Chipman could not be located at the time of trial; she apparently had disappeared.

### Conclusions of Law

This case centers around two issues. First, whether the search warrant and subsequent search of September 1, 1979 were legal. Second, whether the warrantless search and arrest of September 4, 1979 were legal. Plaintiffs contend both incidents are illegal because both incidents violated their fourth [1] and fourteenth [2] amendment rights and section 1983.[3]

### I. September 1, 1979 Incident

The September 1, 1979 incident can be broken down into several separate issues which the court will deal with in turn. Those issues are: the veracity of the affidavit sworn to support the search warrant, the reliability of the informant, the description of the place authorized to be searched, and the means of effecting the search.

Bates alleges the affidavit supporting the search warrant contained false statements and thus, Officer Spielman committed a fraud upon the court by swearing out an affidavit which he knew contained mate-

rial misstatement of facts. The court disagrees.

■ In *United States v. Gaertner*, 705 F.2d 210, 212 (7th Cir.1983), the Seventh Circuit stated:

When challenging a search warrant on the grounds that the underlying affidavit contains material misstatements of fact, the defendant must establish by a preponderance of the evidence that the statements contained in the affidavit were indeed false and were intentionally included by the affiant, or with reckless disregard for the truth, and that if the false statements had not been recited in the affidavit, the magistrate would have been unable to find the probable cause necessary for the issuance of the search warrant. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Furthermore, affidavits supporting search warrants must be read in a common sense fashion and not in a nitpicking, hypertechnical manner. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

Bates has failed to meet his burden of proof. The statements made by the officer were not false as they were corroborated, in part, by police procedure and by physical evidence apart from the informant's statements.

The plaintiffs attack the information regarding an informant making heroin buys from Mr. Bates. They allege Officer Spiel-

---

**1.** The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const. amend. IV.

**2.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV § 1.

**3.** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

man knew the statements were false and made them anyway. In actuality, this attack on the veracity of the affidavit is merely a variation on Mr. Bates' main allegation which centers on the reliability of the informant and the reliability as shown from the face of the affidavit. If the informant was reliable and that reliability is evident on the affidavit's face or if Officer Spielman had the good faith belief the informant was reliable and the reliability was shown on the face of the affidavit, then plaintiffs have failed to meet their burden of proof on these issues.

■ The underlying critical question in these issues is whether an independent and detached magistrate, looking at an affidavit purportedly supporting the proposed issuance of a search warrant, can determine probable cause. *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir.1982). *See also Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1947); *United States v. Martinez-Torres*, 556 F.Supp. 1236, 1245–46 (S.D.N.Y.1982). While the term "probable cause" is not susceptible to a precise definition, *see Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), probable cause in the context of the issuance of search warrants is generally defined as facts which are sufficient to satisfy a reasonable person that a crime is being committed or evidence of it is being kept on the premises to be searched. *Rambis*, 686 F.2d at 622; *Martinez-Torres*, 556 F.Supp. at 1246. *See also Gerstein v. Pugh*, 420 U.S. 103, 111–12, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975). "Probable cause exists when the information before the detached and neutral magistrate establishes the probability—not a prima facie showing—of criminal activity. *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228 [13 L.Ed.2d 142] (1964)." *United States v. Whitney*, 633 F.2d 902, 906 (9th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981).

The affidavit in question describes the two controlled buys made by the confidential informant on the two days prior to the September 1, 1979 search. The affidavit recites the informant was strip searched before and after her buy from Bates on August 30, 1979. She purchased heroin which tested out at a weight of .23 grams. She further made another controlled buy on August 31, 1979, purchasing heroin verified to be of good quality and in the amount of .28 grams. The affiant also stated the informant told him Bates stated he had two more grams of heroin and cocaine. Bates showed the informant the cocaine. The officer affirmed he believed the informant to be credible and reliable who had actual personal knowledge of the two controlled buys. The officer based his belief about the informant's credibility and reliability on the fact informant made two controlled buys set up by police after she came. to them, telling them Bates sold drugs.

The reliability of the informant issue and its consequent issue of the falsity of the affiant's statements are addressed and resolved by applying the established *Aguilar-Spinelli* test for informant information in an affidavit. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Under *Aguilar-Spinelli*, the affidavit which relies upon an informant to demonstrate probable cause must contain facts sufficient to demonstrate one, that the informant was credible or his information reliable (the veracity prong), and two, that the informant based his conclusions on adequate knowledge (the basis of knowledge prong). *Aguilar*, 378 U.S. at 108, 84 S.Ct. at 1509; *Spinelli*, 393 U.S. at 413, 89 S.Ct. at 587. Probable cause may be established by hearsay evidence. *Franks v.· Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978).

■ While the informant did not have a history of accurate information, a strong basis for inferring reliability under the veracity prong, *see United States v. Marino*, 682 F.2d 449, 453 (3d Cir.1982), the affidavit does show the informant was, nevertheless, credible and her information reliable.

The informant approached the police relating her belief Bates sold drugs. She willingly participated in two controlled buys set up and monitored by the police. The fact of her participation in the controlled buys establishes her credibility. Further, independent corroboration by the police that the alleged heroin purchased in the controlled buys was heroin of good quality helps establish the informant's reliability. There is also the independent corroboration of the buys themselves, *i.e.*, the informant performed in the manner instructed, in a controlled atmosphere, in view, as far as possible, of various police officers participating in the investigation. "Where ... there has been corroboration of many of the details given by the informant, demonstrating [her] truthfulness as to at least some of the information conveyed, it has been held that such corroboration shows that the informant is reliable within the meaning of *Aguilar*." *United States v. Stevens*, 543 F.Supp. 929, 936 (N.D.Ill. 1982). *See also United States v. Ward*, 703 F.2d 1058, 1061 (8th Cir.1983). The court concludes the veracity prong of the *Aguilar-Spinelli* test is satisfied. The court also concludes the officer, in good faith, believed in the reliability and credibility of the informant.

■ The second prong of the *Aguilar-Spinelli* test is the basis of knowledge prong and is the arguably more crucial of the two prongs. *See Marino*, 682 F.2d at 453; *United States v. Swan*, 545 F.Supp. 799, 807 (D.Del.1982). "It is axiomatic that personal observation is an adequate source of information." *Martinez-Torres*, 556 F.Supp. at 1247. *See United States v. Massey*, 687 F.2d 1348, 1355 (10th Cir.1982) (affidavit "detailed the informant's direct personal contact with the participants"). The informant here spoke to the affiant from her personal knowledge and observation. Further, the affiant was present in the area before, during, and after the controlled buys, thus able to ascertain and reassure himself that the informant spoke from personal knowledge. There is more than sufficient evidence to support the officer's good faith belief there was a real basis to informant's knowledge.

The affidavit shows the informant spoke from her personal knowledge and spoke with some detail about the drug transactions. The quantity, nature, specificity and degree of detail also serve to verify the basis of the informant's knowledge of the events which form the basis of the affidavit for a search warrant. *Spinelli*, 393 U.S. at 416, 89 S.Ct. at 589. This alternate to personal knowledge is known as the self-verifying detail test and is another way to satisfy the basis of knowledge prong of the *Aguilar-Spinelli* test. *Marino*, 682 F.2d at 453; *Swan*, 545 F.Supp. at 807; *Martinez-Torres*, 556 F.Supp. at 1247.

The affidavit satisfies the second prong through satisfaction of the self-verifying detail test in addition to satisfying the basis of knowledge prong because the informant spoke from personal knowledge. There is sufficient detail about the nature of the transactions, the quantity of transactions and the specific details of the transactions. These were drug buys of good quality heroin, a serious drug, occurring two different times but always under police supervision. The informant told of her conversation with Bates during the second heroin buy, specifically recalling his representation he had over two more grams of heroin and cocaine. The informant also specifically stated Bates showed her the cocaine. The affidavit is self-verifying.

■ Thus, the informant was reliable, in fact, and the statements of the affiant were truthful, in fact. No constitutional violations arise out of either the informant and her information or the statements made by the officer. The actual existence of probable cause, which is the case here based on the affidavit, is an absolute defense and bar to section 1983 actions. *Terket v. Lund*, 623 F.2d 29, 31 (7th Cir. 1980). *Accord Howell v. Tanner*, 650 F.2d 610, 614 (5th Cir.1981), *cert. denied*, 456 U.S. 918, 102 S.Ct. 1775, 72 L.Ed.2d 178; *Hunter v. Clardy*, 558 F.2d 290 (5th Cir. 1977); *Beauregard v. Wingard*, 362 F.2d 901 (9th Cir.1966). It follows that if actual

probable cause existed based on reliable information received from an informant and on truthful statements made by the affiant, then the affidavit correctly held a good faith belief that the informant and information were reliable and that his statements made in the affidavit were truthful.

There are two remaining issues raised in connection with the September 1, 1979 search which need to be addressed: the description of the place to be searched and the means of effecting the search. *Steele v. United States No. 1*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925), holds that a search warrant's description of the place to be searched is sufficient "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." Again, as in the issues previously discussed, Bates' challenge to the description contained in the search warrant is actually a challenge to probable cause.

The description issued in the search warrant described, "a white, two (2) story, wood frame apartment house, said Heroin is in an apartment, located on the second floor of the building and the basement, which is used to sell alcoholic beverages. Said building is commonly known as 820 E. [sic] Pontiac Street." "[T]he scope of a warrant to search is dependent upon the extent of the showing of probable cause. The command to search can never include more than is covered by the showing of probable cause to search." *United States v. Hinton*, 219 F.2d 324, 325 (7th Cir.1955).

The general rule in descriptions involving multiunit dwellings being searched is that probable cause must exist for each unit. *Id.* at 326. *Accord United States v. Higgins*, 428 F.2d 232 (7th Cir.1970); *United States v. Busk*, 693 F.2d 28 (3d Cir.1982). One generally accepted exception to the multiunit dwelling rule obtains when an entire multiunit dwelling is actually being used as a single unit. *Higgins*, 428 F.2d at 235; *Hinton*, 219 F.2d at 326. *See also United States v. Gonzalez*, 697 F.2d 155, 156 (6th Cir.1983); *United States v. Whit-*

*ney*, 633 F.2d 902 (9th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981). The other accepted exceptions are when the entire premises are suspect, the multiunit dwelling is under the defendant's control, or the multiunit character of the premises is not known or apparent to the officers applying for and executing the warrant. *United States v. Gilman*, 684 F.2d 616, 618 (9th Cir.1982); *United States v. Whitney*, 633 F.2d at 907 n. 3.

Here, the description of probable cause arguably goes only to one apartment on the second story. However, the officers had no way of knowing that the complex, which appears to be one structure from the outside, was, in fact, a multiunit dwelling. The officers testified they did not know until they got inside the structure that the units were inaccessible from one to the other from the inside. The entire premises were suspect. The police knew Charles Bates owned the entire structure and paid utility bills for the structure, addressed to 820 East Pontiac Street. The police in good faith believed the structure to be a single unit and believed the entire structure to be under the control of Charles Bates, the person named in the search warrant. Although Mr. Bates actually resided in the cement block portion of the structure, this court finds the description in the search warrant of a "white, two story frame apartment house" to be a competent description of the complex at 820 East Pontiac Street. The description describes the structure as it appears from Pontiac Street, which is the front of the structure and bears the number 820.

In fact, Bates was in control of the entire unit. It did appear to be a single unit and used as such. The probable cause went to the entire structure. The description of the search warrant, naming the entire complex at 820 East Pontiac, is supported by the probable cause as spelled out in the search warrant. Alternatively, even assuming the search warrant does not spell out probable cause for each unit in the complex, all of the exceptions to the gener-

al rule are met here. Based upon the court's review of the evidence, the defendants had a good faith belief the search warrant description was supported by probable cause. Plaintiffs' fourth amendment rights were not violated by the description of the place to be searched.

The last issue raised regarding the September 1, 1979 search is the means of effecting the search warrant. Plaintiffs complain about the quick knock entry and allege the search was not effected in a reasonable manner.

Entry into the Bates complex where the Bates reside can only be done after going through two steel doors, opened by buzzers in the Bates residential area. Bates' complex was, then, barricaded; it was not a typical home. The police, as a precaution, placed an explosive charge on the outer steel door prior to knocking and requesting entry. They did knock, but received no response. Further, Mr. Bates was observed in the bathroom, potentially destroying or disposing of evidence. There was a real danger of destruction of evidence.

■ The police conduct in effecting entry violated no constitutional rights of the plaintiffs. In fact, under similar facts or circumstances, police have effected no-knock entries and said entries were found to be legal. *United States v. Jefferson,* 714 F.2d 689 (7th Cir.1983). *See Dalia v. United States,* 441 U.S. 238, 247, 99 S.Ct. 1682, 1688, 60 L.Ed.2d 177 (1979) (officers may break and enter if such entry is the only means by which to execute the warrant effectively). The police officers chose the correct means to effect entry into Mr. Bates' barricaded complex.

■ Plaintiffs allege the police violated their constitutional rights by the way in which the officers executed the search warrant. They allege the police tore up their residential area and their belongings. They further allege Mr. Bates' genital area was deliberately exposed to Ms. Bates and his children who were present at the time of the search. They allege the officers ate their food and needlessly terrorized the oc-cupants during the search. After carefully reviewing the conflicting testimony on these allegations and observing the demeanor of the various witnesses, the court finds none of the allegations to be true.

The officers performed their functions as police officers. They did nothing untoward or outside of their capacity of police officers executing a valid search warrant for which they believed probable cause existed. Those officers, who were not the investigators on the case, who were simply performing their required police duties, were relying on a facially valid search warrant and relying upon information given them by fellow police officers. *See Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bezdek v. City of Elmhurst,* 70 F.R.D. 636 (N.D.Ill.1976); *Farmer v. Lawson,* 510 F.Supp. 91 (N.D.Ga.1981).

The officers involved did not execute the warrant in an unreasonable manner. *Cf. Duncan v. Barnes,* 592 F.2d 1336 (5th Cir. 1979); *Tarpley v. Greene,* 684 F.2d 1 (D.C. Cir.1982); *Johnson v. Miller,* 680 F.2d 39 (7th Cir.1982) (arrest warrant). *See also Dalia v. United States,* 441 U.S. at 258, 99 S.Ct. at 1694. Drugs were involved; drugs can be hidden in small places and in small containers. The officers disturbed only what was necessary in their search for contraband. Further, the warrant was read to Mr. Bates before the search was made. Mr. Bates knew the scope of the warrant and the scope of the search being conducted by the officers. There was no constitutional violation in the means employed to effect the valid search warrant.

## II. The September 4, 1979 Incident

The second major area of this lawsuit stems from the warrantless search of the Bates' living quarters for the person of Tammy Chipman and the subsequent warrantless arrest of Mr. Bates in the alley beside his complex on the charge of preliminary criminal confinement.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63

L.Ed.2d 639 (1980). Warrantless searches are per se unreasonable but there exists "a few specifically established and well delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). These exceptions are generally characterized as "exigent circumstances." *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970); *United States v. Robertson,* 606 F.2d 853 (9th Cir.1979). The exceptions to the per se unreasonable rule are applied on a case-by-case basis, looking specifically at the factual scenario involved. *United States v. Acevedo,* 627 F.2d 68 (7th Cir.1980), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482; *United States v. Blasco,* 702 F.2d 1315 (11th Cir.1983). "Those asserting the propriety of their [warrantless] entry bear a heavy burden of showing they had an urgent need to cross the threshold [of a residence] without a warrant." *Acevedo,* 627 F.2d at 70. Exigent circumstances cannot be created by police officers to justify warrantless searches. *United States v. Thompson,* 700 F.2d 944 (5th Cir.1983). *See United States v. Rosselli,* 506 F.2d 627 (7th Cir.1974).

Among the circumstances recognized as exigent is the circumstance of danger of harm to others which includes confidential informants. *Blasco,* 702 F.2d at 1325; *Thompson,* 700 F.2d at 947; *Dorman,* 435 F.2d at 392.

■ Exigent circumstances existed. The police were aware Ms. Chipman had not been seen for several days. Then a person approached them telling them that he saw Ms. Chipman in the company of Mr. Bates and another near Mr. Bates' complex and that she knew him, but did not speak to him. This information of possible contact between Bates and Ms. Chipman came to the police in the late morning of September 4, 1979. The police knew that Mr. Bates' reputation was that of a violent man and that the street talk was that Bates had put out a contract in the sum of $10,000 on Ms. Chipman's life immediately after he

was released on bond on September 1, 1979. The police also knew that marked money used by Ms. Chipman in the buys had been found among the $6,990.00 confiscated from a cookie bag found in Mr. Bates' closet in the September 1, 1979 search. The police had more than enough probable cause to believe Ms. Chipman's life was in danger and time was of the essence. *Cf. Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). *See also Thompson,* 700 F.2d at 947; *United States v. Baker,* 577 F.2d 1147 (4th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978).

The officers attempted, in a short time span, to obtain a search warrant. They were told by both the Prosecutor's Office and the Honorable Philip R. Thieme that a search warrant could not issue for a live person, but that if they felt this informant was in danger of mortal harm, they would be legally justified in conducting a warrantless search. The police, then, believed they were acting in a reasonable and legal manner in effecting a warrantless search and subsequent arrest. The police officers took all reasonable steps, and they were reasonably entitled to rely on the legal advice given them. While such reliance does not answer the question of whether there existed sufficient exigent circumstances, it is a factor to be considered in determining the reasonableness of the police officers' actions. *United States v. Jackson,* 585 F.2d 653, 661 (4th Cir.1978); *United States v. Johnson,* 561 F.2d 832, 843 (D.C.Cir.1977) (en banc), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080; *United States v. Chuke,* 554 F.2d 260, 264 (6th Cir.1977).

There is no doubt but that exigent circumstances were present here in the form of a very real danger to the life of Ms. Chipman, the confidential informant, whose aid led to the arrest of Mr. Bates. They were told they could not get a search warrant, but that if there was a danger, they must proceed.[4] There was a danger and

---

4. This court expressly notes that it is not finding any exception here under the "community caretaking" exception which applies only to searches involving automobiles. *See Cady v. Dombrow-*

the officers proceeded accordingly. They knocked on the Bates' door, requested entry, and informed Mrs. Bates of the purpose of their visit. They conducted the search, disturbing nothing. Upon finding Ms. Chipman was not concealed on the premises, they left.

■■■■■ Upon their exiting, they came upon Mr. Bates in the public alley. Based on their knowledge at the time and the extreme danger in which they perceived Ms. Chipman, they arrested Mr. Bates with probable cause although without a warrant on a charge of preliminary criminal confinement. The arrest was legal. Warrantless probable cause arrests in public places are not per se unreasonable; they do not violate any constitutional rights. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

■■■■■ Even assuming probable cause did not exist to support the warrantless search and arrest, the police officers are protected under section 1983 if they possessed a good faith belief probable cause existed. Such good faith exists here.

■■■■■ Qualified good faith immunity is available to police officers acting in their official capacities. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *See also Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Lenard v. Argento*, 699 F.2d 874 (7th Cir.1983); *Brubaker v. King*, 505 F.2d 534 (7th Cir.1974). The test for determining good faith of a person acting in his or her official capacity is an objective one. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Public officials acting in their official capacities "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 102 S.Ct. at

2738. Plaintiffs claim violation of the fourth and fourteenth amendments to the Constitution. While *Harlow* does not address specifically whether this objective rule applies to state officials being sued under section 1983, it sets out a very broad hint that it would not make a distinction between suits against state officials and suits against federal officials in applying the objective test for determining good faith. *Id.* 102 S.Ct. at 2738 n. 30. *See also Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Seventh Circuit has taken the hint and applies the *Harlow* test to suits involving state officials being sued for damages under section 1983. *Johnson v. Brelje*, 701 F.2d 1201 (7th Cir.1983); *Crowder v. Lash*, 687 F.2d 996 (7th Cir.1982).

■■■■ The term "probable cause" is not susceptible to a precise definition. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Probable cause exists where the "facts and circumstances [are] 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111–12, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975), *quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Generally speaking, its existence "depends upon the officer's own knowledge *and the knowledge received from others which is reasonably trustworthy*." *United States v. Gaston*, 620 F.2d 635, 638 (7th Cir.1980) (emphasis supplied). *See United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). *See also United States v. Jones*, 696 F.2d 479, 485, n. 6 (7th Cir.1982).

Indiana follows the definition stated above of probable cause. *Fyock v. State*, 436 N.E.2d 1089, 1093 (Ind.1982); *Battle v. State*, 415 N.E.2d 39 (Ind.1981); *Strosnider v. State*, 422 N.E.2d 1325 (Ind.App. 1981). Further, Indiana also follows the rule that probable cause is "determined

*ski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *United States v. Pichany*, 687 F.2d 204 (7th Cir.1982). The exigent circumstances

present here are akin to those found present in *Warden v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967).

upon the basis of the collective information known to the law enforcement organization." *Brown v. State*, 442 N.E.2d 1109 (Ind.1982). *See also Suggs v. State*, 428 N.E.2d 226 (Ind.1981); *Owens v. State*, 427 N.E.2d 880 (Ind.1981); *Benton v. State*, 273 Ind. 34, 401 N.E.2d 697 (1980).

This court, applying the *Harlow* test to the facts of this case, concludes the defendant police officers proceeded with good faith in their search of the Bates' residence and the arrest of Mr. Bates. There can be no doubt but that the police officers had before them a set of facts and circumstances which would lead a reasonable person to believe a crime had been or was being committed.

 There is more than enough here to show an objective good faith belief that probable cause existed. Again, the proof for probable cause does not approach the level of proof needed for guilt beyond a reasonable doubt or even by a preponderance of the evidence. *Draper*, 358 U.S. at 311–12, 79 S.Ct. at 332; *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed.2d 1879 (1949). *See also McKinney v. George*, 556 F.Supp. 645 (N.D.Ill.1983). The standard is whether there could be a reasonable belief a crime was being or had been committed. *Gerstein*, 420 U.S. at 111–12, 95 S.Ct. at 862; *Beck*, 379 U.S. at 91, 85 S.Ct. at 225. For the officers in this situation to have acted any differently than they did would have left them open to a charge of dereliction of their duty. *See Pierson*, 386 U.S. at 555, 87 S.Ct. at 1218. A reasonable suspicion of guilt is sufficient to support a good faith belief in the existence of probable cause.

*Dumbra v. United States*, 268 U.S. 435, 441, 45 S.Ct. 546, 548–49, 69 L.Ed. 1032 (1925). *See Strosnider v. State*, 422 N.E.2d at 1328. *See also McKinney*, 556 F.Supp. at 648. Defendants are entitled to invoke immunity from this suit for civil damages under section 1983 for alleged violations of the fourth and fourteenth amendments.[5]

 As it has held previously, this court finds actual probable cause existed for the warrantless search and arrest. A reasonable person would, under the facts and circumstances of this case, believe that a crime was being committed on the questioned premises or evidence of the crime was being kept on the premises to be searched. *Rambis*, 686 F.2d at 622. A reasonable person would also, under the facts and circumstances of this case, believe "the suspect had committed or was committing an offense." *Beck*, 379 U.S. at 91, 85 S.Ct. at 225. The actual existence of probable cause is an absolute defense and bar to section 1983 actions. *Terket*, 623 F.2d at 31. *See Pierson*, 386 U.S. at 555, 87 S.Ct. at 1218 ("Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved.") *Cf. Baker v. McCollan*, 443 U.S. 137, 143–45, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979) (arrest of wrong person pursuant to valid warrant not a cognizable section 1983 claim).[6]

*Conclusion*

Plaintiffs have failed to establish by a preponderance of the evidence that the ac-

---

5. The fact that it turned out Ms. Chipman was not being confined by Mr. Bates does not obviate the existence of a good faith belief in and the actual existence of probable cause for his arrest and the search of his residence. Bates' innocence, as shown later, is "largely irrelevant [to his 1983 suit]. The Constitution does not guarantee only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

 The court notes that Ms. Chipman disappeared before trial and was never heard from again.

6. The City of Fort Wayne also is not liable under section 1983 through the doctrine of *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because no constitutional injury or deprivation of any kind was proven. Where there is no injury proven to a plaintiff, there is no need to go further to see if any municipal policy was responsible for the unproven injury. *Monell; Powe v. City of Chicago*, 664 F.2d 639, 643 (7th Cir.1981). If the city employees are found not liable on grounds other than their qualified immunities, then the city also cannot be held liable.

tions of defendants violated their constitutional rights secured by the Constitution and section 1983. Accordingly, the court finds in favor of the defendants and against the plaintiffs.

This memorandum of decision contains the court's findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).