Wesley J. BIGLER, II, Appellant–Defendant

v.

STATE of Indiana, Appellee–Plaintiff.

No. 84A01–9110–CR–311.

Court of Appeals of Indiana, First District.

Oct. 27, 1992.

Rehearing Denied Jan. 5, 1993.

Transfer Denied Feb. 17, 1993.

Joseph K. Etling, Terre Haute, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-plaintiff.

ROBERTSON, Judge.

Wesley J. Bigler, II appeals his conviction and sentence of two counts of dealing in a schedule II controlled substance, class B felonies.

We affirm.

Bigler raises the following issues in this appeal:

(1) whether evidence obtained pursuant to a search warrant for Bigler's residence was properly admitted;

(2) whether the trial court committed reversible error by giving instruction number 13;

(3) whether there was sufficient evidence of probative value to sustain Bigler's conviction of the two counts of dealing in a controlled substance; and,

(4) whether the sentence imposed violates the Double Jeopardy, Equal Protection or Due Process Clauses of the federal and state constitutions or is manifestly unreasonable.

## I.

### Admission of Evidence Seized from Residence

#### A.

Bigler argues first that the search warrant obtained by police was not based upon probable cause. In particular, Bigler contends that the affidavit submitted by law enforcement officers to obtain the warrant was deficient because it contained "no information whatsoever that would indicate that contraband associated with unlawful activity was present in his residence." Drawing upon the United States Supreme Court's *Aguilar/Spinelli* decisions,[1] Bigler argues that the issuing magistrate could not have relied upon the information which

---

1. *Aguilar v. Texas* (1964), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 and *Spinelli v. United States* (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. These cases provided that when an affidavit relies upon an informant's tip, the affiant must establish the basis of his informant's knowledge, i.e., the particular means by which the informant came by the information in the report, and provide facts which would establish either the general veracity of the informant or the specific reliability of the report in the particular case. *Massachusetts v. Upton* (1984), 466 U.S. 727, 729, 104 S.Ct. 2085, 2086, 80 L.Ed.2d 721.

had been obtained from a police informant because the affidavit does not include either a history of the informant's reliability or extrinsic facts from the informant or other proper sources which would attest to the accuracy of the information provided. Bigler also contends that the information contained in the affidavit was not trustworthy because it was stale.

▆▆▆ Bigler acknowledges that the Court has abandoned the two-pronged *Aguilar/Spinelli* test in favor of an approach which permits an issuing magistrate to consider the "totality of circumstances." Now, in determining whether an application for a search warrant is supported by probable cause, the task of the issuing magistrate is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that evidence of a crime will be found in a particular place. *Illinois v. Gates* (1983), 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527. The magistrate considers the affidavit in its entirety, giving significance to each relative piece of information and balancing the relative weights of all the various indicia of reliability and unreliability attending the information. *Massachusetts v. Upton* (1984), 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721. Great deference is accorded the magistrate's determination by the reviewing court. *Id.* Our duty is simply to ensure that the magistrate had a "substantial basis" for concluding that probable cause existed, *id.*, not to undertake a de novo determination of probable cause. *Gates*, 462 U.S. at 237, 103 S.Ct. at 2331–32. With this standard of review in mind, we examine the affidavit's contents.

1. The affidavit summarizes the information collected by Detective John Lewis since 1987 "from various confidential informants and law enforcement agencies in California, Connecticut and Indiana." Lewis suspects Bigler to be an active member of a multi-state motorcycle gang known as the Diablos and an import and wholesale amphetamine dealer within the Diablos' interstate distribution ring. Bigler's favored method of communicating with his distributors is believed to be by radio pager. After being contacted through the pager, Bigler typically arranges a meeting at which he will deliver amphetamines, obtain payment, or both. Bigler often will "front" amphetamines to his distributors who then sell the amphetamines and repay him. Bigler receives delivery of his supply from Chuck Persinger, a high-ranking Diablo.

In October, 1988, Lewis learned from Meriden, Connecticut police that Phil Grimm, a member of the Connecticut branch of the Diablos, had fled that state with $250,000 in drug money after two members of the gang had been arrested for their involvement in the sale of amphetamines. Grimm had relocated to Vigo County, Indiana. Lewis identified Bigler's residence and residential phone number and obtained a court-approved pen register of Grimm's residential phone. Grimm had repeated communications with Bigler via Bigler's residential phone. According to Lewis, Grimm suffered "an amphetamine related death" in November, 1989. A Vigo County Sheriff's report indicates that Bigler reported the death and Grimm's home was left in Bigler's custody when emergency personnel departed with the body.

2. The affidavit details the results of certain amphetamine transactions conducted by Officer Bensinger, the other affiant, or observed and recorded by the department's other narcotics officers. Between October 19 and October 26, 1990, Officer Bensinger made three purchases involving a total of six grams of amphetamine from a Marcella Albright. On November 13, 1990, he completed a fourth transaction during which he purchased seven grams of amphetamine and arrested Albright. Albright named Paula Milner as her source and stated she owed Milner $550.00 for the drugs Milner had "fronted." That same day, the officers arranged for Albright to pay off Milner. The transaction was recorded and Milner was arrested with the buy-money and amphetamines in her possession.

3. The affidavit recites the information obtained from Milner following her arrest.

Milner implicated "Wes" Bigler as her source and confirmed that this individual was a member of the Diablos gang, an organization in which her brother belonged. Over the two-year period Milner had been dealing, Bigler had delivered to her one-half to two ounces of amphetamine every week to two weeks. Milner received her last delivery of approximately ½ ounce on November 10, 1990, ¼ of which was in police custody, having been confiscated from Albright. Milner would contact Bigler by pager or at home, he would "front" the drugs to her, and then they would schedule a separate meeting at which Milner would repay Bigler and obtain more drugs. Lewis asserts that Milner displayed an intimate knowledge of "crank" dealing including correct weights, prices and terminology; Milner described in detail the layout of Bigler's house and its location south of the federal penitentiary; Milner responded to questioning quickly and coherently and volunteered information about Bigler without prompting; and Milner accurately described Bigler's physical appearance.

4. The affidavit abstracts a phone call made by Milner to Bigler at the number identified by Lewis for Bigler through the pen register and listed in the GTE phone directory as Bigler's residential number, which Lewis witnessed and recorded. Milner recognized Bigler's voice, Bigler responded to "Wes" and Bigler appeared to recognize "Paula." When Milner told "Wes," that she had the money for the "roof," Bigler acknowledged that Milner owed him money and suggested that they meet the next day at her workplace so that she could repay him. Milner did not work the next day so they arranged for her to phone instead. No contact was made between Milner and Bigler the following day. Milner used the term "roof" because she never used common names for drugs in her conversations with Bigler "for security reasons."

5. The affidavit contains statements of opinion from Lewis based upon his experience as a narcotics officer concerning the types of evidence of drug dealing commonly found in the residences of dealers, including business and financial records, proceeds, paraphernalia used for distributing controlled substances, and cutting agents.

■ We focus our inquiry immediately upon the information obtained from Milner. The affidavit recites many of the underlying circumstances which led Lewis to believe that Milner is credible and her information reliable. Lewis indicates that from his own investigation, he knows what Bigler looks like, where he lives, what his phone number is, and his modus operandi. Whatever Lewis' source, Milner's information corroborates Lewis' pre-existing knowledge. She properly describes Bigler, his residence, his membership in the Diablo organization, and his method of operation.[2] Because Milner is accurate about these facts, it is reasonable to infer that she is probably correct about other facts as well. *Gates*, 462 U.S. at 245, 103 S.Ct. at 2335. Moreover, the affidavit tells the magistrate how Milner came about her information. She engaged in transactions with Bigler. Descriptions of alleged wrongdoing observed firsthand are entitled to greater weight than might otherwise be the case. *Gates*, 462 U.S. at 245, 103 S.Ct. at 2335.

■ The content of the telephone call to Bigler in Lewis' presence, at the number known by Lewis to be Bigler's residential phone number since 1988, is set out with sufficient specificity to confirm that Bigler and Milner in fact know each other, that Milner owes Bigler money, that Bigler obtains payment of debts by arranging a meeting, and that the Wes Bigler implicated by Milner is the same Bigler who communicated with and reported the amphetamine-related death of another Diablo member. That Bigler was an associate of a known user of amphetamines makes Milner's claim that Bigler is her source of amphetamines much less subject to skepticism than would be such a charge against an individual without such a history.

---

**2.** The magistrate may accept the officer's judgment that Milner's information matched the officer's, without requiring Lewis to recite the specifics. *Jaben v. United States* (1965), 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345.

*Jones v. United States* (1960), 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697. And, it matters not that the phone call independently corroborates only innocent activity. Innocent behavior frequently provides the basis for a showing of probable cause. *Gates*, 462 U.S. at 244, n. 13, 103 S.Ct. at 2335, n. 13. What is significant is the degree of suspicion that attaches to particular types of noncriminal acts, a matter assessed by the magistrate. *Id.* Here, the arrangements made during the telephone conversation heighten the level of suspicion because they reasonably corroborate what police believe to be Bigler's method of operation, namely, to "front" drugs and collect his share of the proceeds later. In addition, the recorded conversation establishes that Milner and Bigler in fact know each other. It is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduces the chance of a reckless or prevaricating tale. *Gates*, 462 U.S. at 245–46, 103 S.Ct. at 2335–36.

▮ Lastly, Milner's statements implicate herself in criminal activity other than the single transaction recorded by the narcotics officers. Milner's statements constitute admissions which are admissible against her. Although not the only drawable inference, the magistrate could have attached trustworthiness to these statements because an individual would not risk subjecting herself to criminal sanction and imprisonment unless they were true.

▮ As Bigler asserts, the affidavit contains no direct evidence that contraband has ever been at Bigler's residence. But, the officers did not seek a warrant to search for contraband at Bigler's residence; they sought authorization to search for evidence that the crime of dealing in amphetamines had been or was being committed. Detective Lewis' expert opinion based upon his seven-year experience as a narcotics investigator, that drug dealers frequently keep documents, cash and paraphernalia evidencing their role in the distribution of drugs in their homes, is another important consideration to be weighed by the magistrate reviewing an application for a warrant, *U.S. v. Fama* (2d Cir.1985), 758 F.2d 834, 838, as is the concern that the information offered in the affidavit is too old to be reliable. The facts alleged in the affidavit establish an ongoing operation lasting at least two years, the last known act of distribution having been taken twenty-one days before the officers sought the warrant. Again, the officers were not proposing that they would find amphetamines which are easily moved or destroyed, but evidence which would prove distribution. Under these circumstances, the element of time loses significance and need not weigh heavily in the determination. *See U.S. v. McNeese* (7th Cir.1990), 901 F.2d 585, 596.

▮ In sum, we find a substantial basis in the affidavit for the magistrate's conclusion that evidence of an amphetamine distribution scheme was probably present in Bigler's residence. Nothing more is required by the fourth amendment to sustain the issuance of the warrant. *Jones v. United States* (1960), 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697.

### B.

Bigler contends the warrant was defective because it did not disclose on its face that the officers swore to or affirmed its contents. Bigler insists that Ind.Code 35–33–5–2 requires either the officers swear or affirm in writing that their statements in the affidavit are true, or give sworn testimony in a recorded hearing. Bigler does not maintain that the officers falsified any of the information contained in the affidavit or attempted to deceive the court by placing before it facts to which they could not swear.

▮ An affidavit is a written statement of fact which is sworn to as the truth before an authorized officer. *Dawson v. Beasley* (1962), 242 Ind. 536, 542–43, 180 N.E.2d 367, 370; *Pappas v. State* (1979), 179 Ind.App. 547, 551, 386 N.E.2d 718, 720. The jurat is not a part of the affidavit, but simply evidence that an oath was taken. *Id.* As a general rule, omission of a jurat is not fatal to the validity of an affidavit so long as it appears either from the instru-

ment itself or from evidence aliunde, that the affidavit was, in fact, duly sworn to before an authorized officer. *Gossard v. Vawter* (1939), 215 Ind. 581, 584, 21 N.E.2d 416, 417.

█ At the hearing on Bigler's motion to suppress, the issuing magistrate and affiants testified that the magistrate swore them before they represented that the facts assembled by them in support of the probable cause determination had been recorded in written form and were contained in the affidavit. All the purposes intended to be served by a jurat had been achieved: the magistrate received sworn testimony and all of the testimony received was recorded in the way it was received by the magistrate. Therefore, we must agree with the State that the officers substantially complied with the statutory requirements and complied with the constitutional requirement that the facts be sworn. The absence of a jurat is not cause for invalidating the search.

### C.

Lastly, Bigler insists that the city court judge is without authority to determine probable cause. Formerly, the legislature expressly authorized city court judges to issue search warrants based upon probable cause. See I.C. 35-1-6-1(a) (repealed Acts 1981 P.L. 298 Sec. 9(a)).

█ In effectuating the Fourth Amendment's command that "[n]o warrant shall issue, but upon probable cause," the U.S. Supreme Court has long required that a judicial officer or magistrate make the determination of probable cause. An issuing magistrate must meet two tests: he or she must be neutral and detached, and he or she must be capable of determining whether probable cause exists for the requested arrest or search. *Shadwick v. City of Tampa* (1972), 407 U.S. 345, 350, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783. The Indiana Constitution similarly requires a neutral and detached magistrate, but the existence of probable cause must be a judicial determination, not a ministerial one, to be made by a judge or magistrate. *State ex rel. French v. Hendricks Superior Court* (1969), 252 Ind. 213, 223, 247 N.E.2d 519, 525. The term "magistrate" has been given a broad interpretation; it includes the judge of any court of this state authorized to issue process, to accept pleas, to hear and determine cases and to render judgments. *Id.*

A city court judge has jurisdiction over all misdemeanors, infractions and violations of city ordinances. I.C. 33-10.1-2-2. A judge of a city court "has all powers incident to a court of record in relation to the attendance of witnesses, the punishment of contempts, the enforcement of orders, and the issuing of commissions for taking depositions in cases pending in the court." I.C. 33-10.1-2-1. See *City of Wabash v. Wabash County Sheriff's Dept.* (1990), Ind.App., 562 N.E.2d 1299, 1301 (City court has all the powers incident to a court of record). The judge may administer oaths, give all necessary certificates for the authentication of the records and proceedings of the court, I.C. 33-10.1-2-1, assess fines and impose sentences of imprisonment for less than one year, I.C. 33-10.1-2-4, issue "warrants and processes," see I.C. 33-10.1-5-3, and try cases. I.C. 33-10.1-5-5. Its judgments, decrees, orders and proceedings have the same force as those of the circuit court. I.C. 33-10.1-5-8.

█ Although the legislature has not expressly delegated the power to issue search warrants, it has delegated to the city court judge all of the powers necessary to function as the neutral and detached magistrate or judicial officer required by the federal and state constitutions. Hence, we conclude that the city court judge had the power to make the determination of probable cause and issue a search warrant for Bigler's residence. See *Clark v. State* (1978), 269 Ind. 316, 319, 380 N.E.2d 550, 553 (authority for issuing search warrant not dependent upon jurisdiction of case in which evidence will be pertinent; typically no case is pending when warrants are issued).

### II.

Bigler next argues that the court erroneously instructed the jury that the admissi-

bility of evidence secured by a search warrant is a matter for the judge and not the jury. Bigler maintains that this instruction is an incorrect statement of the law, and is misleading and confusing because it is in irreconcilable conflict with instruction # 12, which charged the jury that it was the judge of both the law and the facts, and because the trial judge permitted Bigler to argue the legality of the search to the jury.[3]

The two instructions are neither in conflict nor erroneous statements of law. The constitutional guarantee contained in Art. 1, § 19, which confers upon the jury the right to determine the law as well as the facts, is not absolute, *Jones v. State* (1983), Ind., 449 N.E.2d 1060, 1065, or exclusive. *Beavers v. State* (1957), 236 Ind. 549, 557, 141 N.E.2d 118, 122. The Indiana Constitution also vests the judicial powers in the Supreme Court, in Circuit Courts and such other courts as the General Assembly may establish. Art. 7, § 1. Under our system of jurisprudence, the judge, not the jury, determines the law as to the admissibility of evidence. *Pointon v. State* (1980), 274 Ind. 44, 408 N.E.2d 1255; *Beavers*, 236 Ind. at 557, 141 N.E.2d at 121. It is the jury's duty to observe and respect this coordinate right set forth in the Constitution, *id.* at 563, 141 N.E.2d at 124, as it is not the judge of the law at every step in the proceedings. *Id.* at 564, 141 N.E.2d at 125. It is for the jury to decide the case under the law and upon the evidence which the court permits to be introduced. *Espenlaub v. State* (1936), 210 Ind. 687, 697, 2 N.E.2d 979, 983.

The trial court permitted the jury to consider the legality of the search but instructed the jury that the court too had ruled upon the legality of the search and determined that the evidence seized was properly admitted. The jury had an obligation to respect this determination. The instruction was not given in a manner designed to bind the consciences of the jurors or restrict them in their right under the

Constitution to determine the law for themselves. *Burris v. State* (1941), 218 Ind. 601, 604, 34 N.E.2d 928, 929. We acknowledge that the law in this area is complex; but, the instructions as given correctly state the law in its complexity and were not misleading when read together. Accordingly, we conclude that the giving of the two instructions together does not constitute reversible error. *Cf. Dudley v. State* (1985), Ind., 480 N.E.2d 881, 903, *habeas corpus granted on other grounds*, 854 F.2d 967, *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (no error in instructing jury to follow court's ruling that Porter County had jurisdiction over charges).

### III.

### Sufficiency of Evidence

Bigler contends the State failed to prove he possessed methamphetamine with the requisite intent to deliver as alleged in count III. He argues that in the absence of evidence of the actual quantity of methamphetamine found in his possession or the actual delivery or sale, there was insufficient evidence to sustain his conviction of dealing by possession with intent to deliver. As to count IV, Bigler maintains the State failed to prove that he was the individual who manufactured the methamphetamine confiscated from the basement of his residence or that the manufacturing of the substance occurred in Vigo County, Indiana.

Contrary to Bigler's assertions, the record contains a considerable amount of evidence that on or about December 7, 1990, Bigler possessed methamphetamine with the intent to deliver. First, the State offered proof of actual delivery through the testimony of Paula Milner, who told the jury that Bigler had been delivering as much as one-half to one ounce of methamphetamine to her per week for about a year and one-half, and a forensic chemist, who identified the substance transferred by Mil-

---

**3.** Although Bigler objected at trial to the instruction, the basis of his objection is not readily apparent. We will assume that Bigler preserved error on the grounds he now raises, namely, that the instruction as given incorrectly states the law and is misleading or confusing.

ner to Albright as methamphetamine. Second, the State's evidence included expert testimony concerning a gallon jug of brown liquid which was seized from Bigler's basement. A sample of the liquid from this jug was tested and found to contain methamphetamine base, the controlled substance itself but which can be more readily absorbed by the body when converted into a powder called methamphetamine hydrochloride. Sold uncut the base would bring $7,000 to $11,000 per pound. It was estimated from the size of the equipment confiscated from Bigler's basement that Bigler had the capacity to manufacture at one time as much as three and one-half pounds of methamphetamine hydrochloride, enough to last one person "a couple of lifetimes." Third, the extent of Bigler's investment in security, manufacturing equipment, and stock of chemicals;[4] the remote location of his residence; the irreplaceability, size and number of pieces of glassware used in the process; the presence of equipment which could be used in a number of different processes and to expedite the process; the range of solvents present which could substitute for each other; the number of empty containers; and the presence of various cutting agents, in combination with the expert testimony explaining the manufacturing process, all established the existence of a very sophisticated commercial venture.

■ Likewise, there was ample evidence that Bigler manufactured the methamphetamine base himself in his home in Vigo County on or about December 7, 1990 as charged in the information. When officers executed the search warrant, Bigler's residence, and, in particular, the room in the basement where the manufacturing

equipment had been stored, still smelled of chemicals. Coffee filters found in the basement room had not yet dried, even though they were thin and flat, indicating to the State's expert that the methamphetamine base seized from the basement had probably been produced within the last week. A white powdery residue was about the room's floor as was debris from the operation. Other testimony established that the fumes from the manufacturing process were so toxic that an individual could not live in the house without knowing that the process was going on and the health of the chemist himself would suffer over time. "How to" books were found in Bigler's bedroom as was a small quantity of methamphetamine, a set of scales, some cutting agents, and a handwritten grocery list of chemicals which the State's expert opined were all used in the manufacturing process for methamphetamine identified by the DEA as "synthesis #3." Finally, Bigler delivered the substance himself or sent others to deliver it for him, and after a time, refused to conduct any further sales in his home. The jury could reasonably infer that Bigler did more than store the equipment in his home, but actually set up the lab and operated it.

## IV.

### Validity of Sentence

The State charged in count III of its information that on or about December 7, 1990, Bigler did possess with the intent to deliver, a controlled substance classified in Schedule II of I.C. 35–48–2, specifically methamphetamine. In Count IV the State alleged that on or about December 7, 1990, Bigler did knowingly manufacture metham-

---

4. Among the items seized from Bigler's residence were a set of O'Haus triple beam scales, a set of electronic digital scales, a Physician's Desk Reference, heating mantels, tubing, a 22,-000 milliliter flask, a 1500 milliliter glass bowl, 12,000 milliliter flasks, a 4,000 milliliter flask, a 2,000 milliliter flask, a 500 milliliter flask, a vacuum pump, a fan, empty bottles of iodine crystals, a 600 milliliter glass measuring cup, a 150 milliliter glass measuring cup, a 50 milliliter glass measuring cup, caps for the flasks, goggles, three respirators, weight covers, a disposable apron, new filters for the respirators, rubber gloves, used coffee filters, mason jars, empty ice bags, several trash cans with hoses connected to them, a plant potter with holes punched in it, a hydrochloric acid box, a condenser, a 4000 milliliter separator funnel, an air pump, a ph test kit, water bottles, stoppers for the beakers, a large hot plate, a customized pressure cooker, distilled water, hydrochloric acid bottles, boxes of baking soda, lye drain opener, an aquacheck test kit for chlorine, a large syringe, denatured alcohol, acetone, rubbing alcohol, several gallon jug containers and two instruction manuals.

phetamine, a controlled substance classified in Schedule II. Bigler received a seventeen-year sentence on each count, to be served consecutively.

Bigler contends that the imposition of multiple punishment on these convictions, which were alleged to have occurred on or about the same date and were based upon the same evidence, violates the Double Jeopardy Clause of the Indiana and United States Constitutions.[5] In addition, he contends the sentence imposed is manifestly unreasonable because the sentencing court relied upon the same factors to enhance the sentence on each conviction as to impose consecutive sentences.

 The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." *Brown v. Ohio* (1977), 432 U.S. 161, 164, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187. The Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense. *Id.* at 166, 97 S.Ct. at 2225. Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. *Id.* The dispositive question is thus whether the legislature intended to authorize separate punishment for the two crimes. *Albernaz v. United States* (1981), 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275.

 The test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment continues to be that stated in

*Blockburger v. United States* (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.

*Id.* at 304, 52 S.Ct. at 182, *quoted in Elmore v. State* (1978), 269 Ind. 532, 534, 382 N.E.2d 893, 895. The test emphasizes the statutory elements of the two crimes, "notwithstanding a substantial overlap in the proof offered to establish the crimes;" it identifies legislative intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. *Iannelli v. United States* (1975), 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1294 n. 17, 43 L.Ed.2d 616. *Cf. Linder v. State* (1985), Ind., 485 N.E.2d 73 (Where one act resulted in both death of victim and destruction of trailer, defendant could be convicted of both voluntary manslaughter and arson). Hence, a single act or transaction can give rise to distinct offenses under separate statutory provisions without violating the Double Jeopardy Clause. *Albernaz*, 450 U.S. at 345, 101 S.Ct. at 1145–46.

 In Indiana, analysis of legislative intent does not end with an evaluation and comparison of the specific statutory provisions which define the offenses. Indiana Code 35–38–1–6 precludes a judgment of conviction and sentence on an included offense. For our purposes, an offense may be included if it is established by proof of the same material elements or less than all the material elements required to prove the charged offense, or

> differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

Equal Protection and Due Process Clauses; therefore, we will confine our review to the federal Double Jeopardy Clause.

---

5. Bigler does not argue the Indiana constitutional guarantee independently of his federal claim. Neither does he argue beyond mention his contention that the sentence imposed violates the

I.C. 35–41–1–16(3). Hence, the factual bases alleged by the State in the information and upon which the charges are predicated must also be examined. *Hall v. State* (1986), Ind., 493 N.E.2d 433, 435.

■ Indiana Code 35–48–4–2(a)(1) and (2) define the charged offenses. Subsection (a)(1)(A) proscribes the offense of dealing by manufacturing, and requires that the State prove a knowing or intentional manufacture of a schedule II controlled substance. "Manufacture" means

the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis ... It does not include the preparation or compounding of a controlled substance by an individual for his own use ...

I.C. 35–48–1–18. Subsection (a)(2)(C) of I.C. 35–48–4–2 requires proof that the accused possessed a schedule II controlled substance with the intent to deliver. A "delivery" is defined as

an actual or constructive transfer from one (1) person to another of a controlled substance, whether or not there is an agency relationship.

I.C. 35–48–1–11.

As charged here, each offense requires proof of at least one element which the other does not. Proof of manufacture is not an element of dealing by possession with the intent to deliver; proof of the intent to deliver is not necessary to establish that a defendant knowingly manufactured in all cases. It would be possible to engage in manufacturing as that term has been defined by statute without ever having the intent to deliver what one produces because even manufacturing by production, propagation, conversion, or processing for one's own use is manufacturing. Neither offense is statutorily included in the other. *Cf. Hawk v. State* (1987), Ind.App., 506 N.E.2d 71 (crimes of child molesting by sexual intercourse and child molesting by fondling or touching with the intent to arouse or satisfy sexual desires not statutorily included).

Our conclusion is reinforced by the fact that the two statutory provisions are directed at separate evils. As the trial court pointed out at sentencing, dealing by manufacturing gives rise to distinct risks of harm, such as the dangers of explosion and those posed by chemical exposure on or near the manufacturing site, harms which are not threatened by mere distribution. The conduct of one who both manufactures and distributes is twice as serious as that of one who does either singly.

■ Factually included offenses occur when, by the manner in which an offense is alleged to have been committed, a lesser offense is also charged. *Sering v. State* (1986), Ind.App., 488 N.E.2d 369, 375. The State does not allege in its charge of dealing by manufacture that Bigler manufactured with the intent to deliver. Its information tracks the language of the statute without any additional factual allegations. Failure to include the specific intent element is fatal to the argument that possession with the intent to deliver is factually included. *See id.* And, the legislature's classification of both offenses as class B felonies suggests that the harms associated with the two forms of dealing, while diverse, are still of the same magnitude.

■ In resolving the double jeopardy question raised here, we distinguish *Mudd v. State* (1985), Ind.App., 483 N.E.2d 782, in which this court vacated a defendant's conviction of possession of marijuana with the intent to manufacture on double jeopardy grounds, reasoning from the Indiana Supreme Court's decision in *Cyrus v. State* (1978), 269 Ind. 461, 381 N.E.2d 472, *cert. denied*, 441 U.S. 935, 99 S.Ct. 2058, 60 L.Ed.2d 664, that a conviction of manufacturing marijuana necessarily includes the offense of possession with the intent to manufacture. Whether or not *Mudd* is a correct application of double jeopardy principles, the State charged essentially one intent, namely, the intent to manufacture. Hence, "[t]he proof required to establish manufacture necessarily establish[ed] [the charged] possession." *Mudd,* 483 N.E.2d

at 784. The same cannot be said of the crimes charged against Bigler. While the crime of possession of a controlled substance may always be committed once the crime of manufacturing by processing or production is complete and the chemicals are synthesized into a controlled substance, it is not true that the offense of possession with the intent *to deliver* is necessarily established by the same proof. Bigler harbored two distinct criminal intents: to knowingly or purposefully manufacture, and then to deliver the substance he had manufactured. The State's proof established that Bigler was both a manufacturer and a retailer. The Indiana legislature has criminalized both forms of dealing.

For the reasons stated, we conclude that the offenses of dealing by manufacturing and dealing by possession with the intent to deliver were intended by the legislature to be distinct crimes for which cumulative punishment may be imposed. The imposition of consecutive sentences on the two counts therefore did not violate the Double Jeopardy Clause of the federal constitution.

Bigler's last argument is that his thirty-four year sentence is manifestly unreasonable. He contends that it is manifestly unfair to use the same factors to aggravate each of his sentences as to justify consecutive sentencing.

 A trial court has wide discretion in sentencing. Upon review, we do not set aside or alter a sentence that is within statutory limits unless the record reveals a manifest abuse of discretion. *Arthur v. State* (1986), Ind., 499 N.E.2d 746, 748.

 The presumptive sentence for a class B felony is a fixed term of ten years, with not more than ten years added for aggravating circumstances. I.C. 35–50–2–5. The present sentences were within the terms set forth by the legislature in sentencing provisions. A reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and character of the offender. A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for whom such sentence was imposed. Ind.Appellate Rule 17(B). The same single aggravating factor may support both the enhancement of a presumptive sentence and the imposition of consecutive sentences. *Davidson v. State* (1990), Ind., 558 N.E.2d 1077, 1092.

 The trial court cited Bigler's criminal history as one of the aggravating circumstances, specifically, Bigler's convictions of burglary and forgery with an executed sentence which was imposed about February, 1966 and conviction of interstate transportation of stolen goods and property, a felony, for which sentence was imposed on or about May 6, 1966. But the presentence investigation report shows additional criminal offenses as well including a history of three larceny offenses as a juvenile. A prior criminal history alone is sufficient to support an enhanced sentence. *Wills v. State* (1991), Ind., 578 N.E.2d 363, 365.

The court also found as an aggravating factor the statutory consideration that a lesser penalty would depreciate the seriousness of the offense, observing that if there is to be any deterrent effect from the sentencing of drug dealers, it must be from the sentencing of the source, the manufacturer. The court gave the following factual explanation:

The facts of this case indicate that the defendant owned and operated a very sophisticated laboratory capable of manufacturing large amounts of methamphetamine. The evidence further shows that the defendant possessed large amounts of raw and cut amphetamine for purposes of sale manufactured by the lab. An inference can be drawn that the defendant was capable of manufacturing, and did manufacture, large amounts of methamphetamine which trickled down through many levels of our community. The operation of such a clandestine laboratory creates a great danger to our community not only from the standpoint of the infusion of large amounts of dangerous controlled substances into our community but also the risk of explosion of

the laboratory itself. The Court concludes that these factors indicate that these crimes create a serious harm to the welfare of the community and must be hopefully deterred by a sentence commensurate with the seriousness of the crime.

In addition, the court found that Bigler was a person in need of correctional or rehabilitative treatment best provided by his commitment to a penal facility.

The court also cited the mitigating circumstances which he *did not find* to exist in this case, namely that the crime was not the result of circumstances unlikely to reoccur, there having been evidence of a pattern of production; that Bigler's character and attitude did not indicate that he was unlikely to commit another crime; that he is not one likely to respond affirmatively to probation or short term imprisonment; and that at the time of his arrest he was unemployed. The court did find as mitigators the fact that Bigler had children and his health was poor.

We must agree with the sentencing court that the circumstances favoring long-term commitment to a penal facility far outweigh the hardship occasioned on Bigler's family and his health. Bigler does not now point to any mitigating circumstances which the trial court failed to consider nor has he shown us how the evidence reasonably supports only a much reduced sentence. Bigler's sentence is within the range of reasonableness when compared with the sentences imposed in other drug dealing cases. *Cf. Saunders v. State* (1992), Ind., 584 N.E.2d 1087 (Consecutive sentences on three dealing counts for a total of seventy years not manifestly unreasonable in light of defendant's two-offense criminal history, fact present offenses committed while on parole and finding appellant likely to commit another crime); *Sharp v. State* (1989), Ind., 534 N.E.2d 708 (Consecutive, presumptive sentencing on three class B felony counts for thirty years and concurrent terms on three other counts not manifestly unreasonable even though defendant did not have prior criminal history); *Fassoth v. State* (1988), Ind., 525 N.E.2d 318 (Sentence of forty years for concurrent forty-year sentences on two class A felony dealing counts and one class C possession not disproportionate to crimes).

Judgment affirmed.

BAKER and BUCHANAN, JJ., concur.