Teresa D. **FIGERT** and Byron Green, **Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 50A03–9612–CR–446.**

Court of Appeals of Indiana.

June 23, 1997.

Transfer Granted Sept. 3, 1997.

E. Nelson Chipman, Jr., Richard A. Eaton, Plymouth, for Appellant–Defendant.

Jeffrey A. Modisett, Attorney General, Katherine Modesitt, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

GARRARD, Judge.

Teresa D. Figert and Byron Green bring this interlocutory appeal challenging the denial of their motion to suppress. Figert and Green contend that a warrant authorizing the search of their trailer was defective for want of probable cause.

We affirm.

The facts relevant to this appeal are contained in the probable cause affidavit which resulted in the search warrant for Figert's and Green's trailer. Omitting formal parts, the affidavit is as follows:

2. On Wednesday, May 8, 1996, I spoke with Confidential Informant 20–96. Confidential informant 20–96 advised that his neighbor Virgil T. Spiers was involved in crack cocaine. Confidential Informant 20–96 advised that Virgil T. Spiers was getting his crack cocaine at the first residence, on the west side of the roadway, on Upas Road. The residence is north of Monterey Road. The residence is called "The Farm" and "The junk yard."

3. On Tuesday, May 14, 1996, Confidential Informant 20–96 took me to a location located by the farm (second trailer west of Upas Road on the north side of Monterey Road) where I met Virgil T. Spiers. Confidential Informant asked Virgil Spiers if he could obtain any crack cocaine. Virgil stated that he could and that he had to go to the farm. I then paid Virgil $60.00 in U.S. currency for the crack cocaine. Approximately a few minutes later a red Buick, license plate 50E364, was westbound on the Monterey Road. Virgil motioned for the vehicle to stop and he got into the vehicle and returned with three small zip lock baggies each containing a white rock substance and delivered them

to me. The vehicle license plate returned to Angela and RT Roberts, 20831 Upas Road, Culver, Indiana. In my experience as a narcotics officer the substance delivered to me was "rock" or crack cocaine.

4. On May 15, 1996, I met with Virgil Spiers again to purchase crack cocaine. I paid him $100.00 and he advised me to take him to "the Farm." I dropped him off in front of the residences at the "Farm" and watched him walk up the driveway. He met with several male black subjects and disappeared from my view between the three trailers. He then reappeared and walked back up the driveway and he delivered to me approximately five white rocks of crack cocaine.

5. On May 17, 1996 I again met with Virgil Spiers and advised him that I did not want to buy from him but I wanted to be introduced to his connection at "the Farm." Mr. Spiers advised me that I should drop him off and he would have his connection come out and deal with me down the road. I dropped him off at the "farm" and waited. Shortly thereafter I saw a blue Oldsmobile being driven by a young black man with Mr. Spiers in the passenger side exit from the driveway of the farm; they motioned for me to follow them and we traveled down the road for a short distance. They then stopped and I got into their car. The black male handed me a baggie with approximately nine rocks of crack cocaine and advised he needed $180.00. I paid him the money and he advised that he lived in one of the trailers at the farm but his parents were home and therefore he needed to make the deal away from the residence.

6. On May 24, 1996 at approximately 7:30 p.m. I again went to the "farm" with an informant to attempt to purchase additional crack cocaine. I went into the driveway of the farm and observed three trailers used as residences. There were also a large number of junk vehicles at the residences. As we went into the driveway a black male approached the car and we requested to purchase drugs. He was suspicious and asked us to come back with a pipe so that he could smoke crack cocaine with us to know we were not policemen. I

stated that I had the money and was in a hurry and wanted to make the deal. He then pulled a large handful of prepackaged crack cocaine from his pants pocket and I purchased $100.00 worth which was 5 separate baggies, each containing separate rocks and flakes of crack cocaine. He then put the remaining handful of small baggies back into his pocket and went back into the first trailer which he advised he was renting.

7. "The Farm" is described as being comprised of three separate trailers and numerous junk vehicles at 20831 Upas Road, Culver, Marshall County, Indiana, between 20B Road and the County line on the west side of Upas Road. The three trailers are in a "U" shape and are surrounded by rural fields and no other close neighbors or residences. There are currently a large number of unidentified individuals living in and frequenting the three trailers. The first black individual that provided the crack cocaine in the blue Oldsmobile resided in the middle trailer. The last black male to provide crack cocaine tonight resides in the first trailer closest to Upas Road.

8. The Multi–County Drug Task Force has been receiving intelligence information since the summer of 1995 regarding individuals purchasing crack cocaine at a place called "the Farm" in rural Marshall County that serves as a residence of numerous black individuals. The undersigned has probable cause to believe that additional crack cocaine, paraphernalia, and evidence of crack cocaine dealing will be found within the three trailers and within the junk vehicles located within the curtilage of the three trailers.

 Based upon the above affidavit, a warrant was issued to search all three trailers at the Farm. The subsequent search of trailer three revealed small amounts of cocaine and marijuana, other drug-related paraphernalia, and a pistol. Figert and Green, as residents of trailer three, contend that the affidavit failed to establish probable cause to justify including their trailer within the scope of the search warrant. The State counters that the affidavit establishes that the Farm is

a collective dwelling, thereby justifying entry into all three trailers.[1]

■ In determining whether probable cause exists to issue a search warrant, the task of the issuing magistrate is to make a practical, common-sense decision whether, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *Bigler v. State*, 602 N.E.2d 509, 514 (Ind.Ct.App.1992), *reh. denied, trans. denied.* We accord great deference to a magistrate's decision that probable cause exists to issue a search warrant. *Ornelas v. United States*, — U.S. —, —, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *Lloyd v. State*, 677 N.E.2d 71, 73 (Ind.Ct.App.1997). On appellate review, our duty is to ensure that the magistrate had a substantial basis of fact for concluding that probable cause existed to issue the search warrant, not to undertake a de novo determination of probable cause. *Gates, supra; Ornelas, supra; Lloyd, supra.*

We were unable to locate any cases directly on point addressing the search of separate residences alleged to be a collective dwelling. However, we find instructive a line of cases addressing searches of multi-unit dwellings such as apartment building. *See United States v. Hinton*, 219 F.2d 324, 325–26 (7th Cir.1955) (for Fourth Amendment purposes, search of two or more apartments is no different than search of two or more separate houses).

■ The general rule regarding search warrants for multi-unit dwellings is that probable cause must exist for each separate unit. *United States v. Butler*, 71 F.3d 243, 249 (7th Cir.1995); *Bates v. City of Ft.*

*Wayne*, 591 F.Supp. 711, 721 (N.D.Ind.1983); *Watts v. State*, 434 N.E.2d 891, 893 (Ind.Ct. App.1982), *reh. denied, trans. denied.* This principle has been recognized in Indiana since *Thompson v. State* where our supreme court stated:

> Where a building or the premises are described in the search warrant or affidavit by a single street number, and more than one family resides at such street number in the building, in a separate apartment; or where more than one separate business is carried on within the premises designated by such street and number by a separate proprietor—plainly upon principle a warrant directed to search the premises designated by such single number would be illegal and void, unless there was something in the affidavit to connect each one of the occupants of the premises with the alleged unlawful act.

198 Ind. 496, 154 N.E. 278, 279 (1926).

One of the leading cases in this area is *United States v. Hinton*, 219 F.2d 324 (7th Cir.1955). In *Hinton*, an affidavit was filed wherein the affiant stated she had seen heroin sold at a certain residence in Chicago. The residence consisted of four separate apartments, but the affidavit failed to identify in which apartment the particular sales were made. A warrant was issued for a search of all four apartments.

> For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses. Probable cause must be shown for searching each house or, in this case, each apartment. If such cause is shown there is no reason for requiring a separate warrant for each resident.... But probable cause must be shown for

---

1. At the suppression hearing, the State introduced additional evidence to buttress its claim that the Farm is a communal property. However, the determination of probable cause is to be based upon only the evidence presented to the issuing magistrate. *Seltzer v. State*, 489 N.E.2d 939, 941 (Ind.1986). The State may not introduce additional evidence to support its contention that probable cause existed at the time of the decision to issue a search warrant. *Flaherty v. State*, 443 N.E.2d 340, 343 (Ind.Ct.App.1983), *reh. denied, trans. denied.* "The issue, therefore,

is whether the affidavit itself, without additional information or testimony presented after the search warrant is executed, alleges sufficient facts upon which the issuing authority could have made an independent determination of probable cause." *Id.; see also United States v. Jacobsen*, 466 U.S. 109, 115, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984) ("reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred").

searching each residence unless it be shown that, although appearing to be a building of several apartments, the entire building is actually being used as a single unit.

*Id.* at 325–26. With this standard in mind, the Seventh Circuit held the warrant void and suppressed all evidence seized. Of particular note to the disposition of this case is the following: "[T]he affidavit does not establish probable cause to search the entire building *without the allegation of facts to show that each of the apartments in the building was the residence of at least one of the persons selling narcotics."* Id. at 326 (emphasis added).

■ We conclude that the principles announced in *Thompson* and *Hinton* are applicable to the facts of this case. "The Fourth Amendment does not differentiate among types of 'homes.' The term is of course broader than, for example, a single-family house." *United States v. Simpson,* 944 F.Supp. 1396, 1405 (S.D.Ind.1996); *Hinton, supra,* at 325–26. As in *Hinton,* the affidavit in this case fails to establish any facts that the persons dealing drugs resided in the third trailer. Paragraph seven of the affidavit establishes the drug dealers' residences as the first and second trailers. Record at 4. Nowhere in the affidavit is there a similar factual allegation implicating trailer three. Thus, in the absence of there factors, the affidavit fails to establish probable cause to justify issuing a search warrant for trailer three.

■ There is an exception to the general rule above which the State's position raises in this case. The exception applies to a building which, although appearing to be several apartments, is actually used as a single residence.[2] *Butler, supra,* at 249; *Hinton, supra,* at 326. Where a building with separate residences is in fact being used as a single unit, probable cause as to a portion of the premises is sufficient to support a search of the entire structure. *Butler, supra.* As with the general rule, we conclude that this exception is also applicable

where it is shown that completely separate structures are in fact being used as a single communal residence. However, we conclude that the affidavit in this case fails to demonstrate that the Farm is in fact being used as a single property by the residents of the three trailers.

■ The facts which the State contends establish the Farm as a single unit are as follows: the three trailers are situated in a "U" shape in a rural area; officers noticed several unidentified individuals around the trailers; during one drug purchase, the dealer disappeared behind the trailers with several other men; and one drug purchase took place in the driveway to the Farm. First, that police observed "unidentified individuals" around the Farm lacks any inferential value on the issue of probable cause. While the other three allegations meagerly suggest community involvement in drug sales, we note that the affidavit also states that on one occasion the drug purchase was removed from the Farm since the dealer's parents were home at the time. Record at 4. That a drug dealer had to leave his residence to consummate a transaction for fear of being detected by his parents undermines the proposition that drug trafficking was a community endorsed enterprise at the Farm. While the affidavit may make one suspicious of the entire Farm, a mere suspicion does not suffice for the requirement of probable cause. *Woods v. State,* 514 N.E.2d 1277, 1280 (Ind. Ct.App.1987). We conclude that these facts are insufficient, as a matter of law, to establish that the Farm is in fact used as a single communal property rather than three separate residences. *Compare Butler, supra* at 249–50 (evidence that defendant, a known gang leader, lived in second floor of apartment and used first floor as a security checkpoint was sufficient to justify conclusion that entire building was used as a single unit); *United States v. Gusan,* 549 F.2d 15 (7th Cir.1977), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977) (evidence that defendant used first floor as access to second floor gambling ring justified searching entire

---

2. Other exceptions include where the entire premises are suspect, the multi-unit dwelling is under the defendant's control, or the multi-unit character of the premises is not known or apparent to the officers applying for the warrant. *See Bates, supra,* at 721.

building). Thus, the search warrant authorizing entry into Figert's and Green's trailer did not issue upon probable cause.

■ Having determined that the affidavit failed to establish probable cause to issue a search warrant for trailer three, we must still determine whether suppression of the evidence is appropriate. The State argues that the good faith exception announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and codified at IND.CODE § 35–37–4–5 (1993) permits the introduction of evidence seized at trailer three. Under the good faith exception, the fruits of an otherwise invalid search will nevertheless be admissible in the State's case-in-chief if the State can show that the officer conducting the search relied in good faith upon a properly issued, but subsequently invalidated, warrant. *Leon, supra; Lloyd, supra*, at 74. An officer is held to an objective standard of reasonableness, and if his behavior does not manifest objective good faith, then exclusion of the evidence is justified. *Leon, supra*, at 922; *Woods, supra*, at 1281. The good faith exception does not apply where (1) the warrant was based upon false information knowingly or recklessly supplied by an affiant; (2) the warrant is facially deficient; (3) the affidavit upon which the warrant was based is so lacking in indicia of probable cause as to render belief in its existence unreasonable; or (4) the issuing judge wholly abandoned his judicial role and failed to perform in a neutral or detached fashion. *Leon, supra*, at 923, 104 S.Ct. at 3420; *Lloyd, supra*, at 74–75. Figert and Green content that the affidavit was so lacking in indicia of probable cause as to render official belief in its validity unreasonable.

■ The primary purpose of the Fourth Amendment is to require that government should secure a warrant issued by a neutral magistrate before searching the homes and effects of citizens. As the Court noted in *Leon*, "Once a warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." 468 U.S. at 921, 104 S.Ct. at 3419. Thus, the Court observed that the "suppression of evidence obtained pursuant to a warrant should be ordered only . . . in those unusual cases in

which the exclusion will further the purpose of the exclusionary rule." *Id.* at 918, 104 S.Ct. at 3418. These statements were recently quoted with approval by this court in *Lloyd v. State*, 677 N.E.2d 71 (Ind.Ct.App. 1997).

Of course this good faith exception should not be available where the warrant was based upon false information knowingly or recklessly submitted by the affiant, where the warrant is clearly deficient upon its face, or where the magistrate is not "neutral and detached." There is no contention that the warrant before us should fail for any of these reasons. Rather it is contended that the affidavit upon which the warrant was based was *so lacking in indicia of probable cause as to render belief in its existence unreasonable.*

Writing for the court in *Lloyd*, Judge Baker cautioned that "in every case where the good faith exception applies, there will automatically be less than probable cause." 677 N.E.2d at 76. In other words, both the legislature and the courts have expressly recognized a good faith exception when a warrant has been issued. We would defeat that recognition and emasculate the exception if, in practice, we equate the reasonableness of the officer's belief with the establishment of probable cause in the affidavit. If any failure on the part of the affidavit to establish probable cause constitutes a lack of the necessary indicia so as to render the officer's belief unreasonable, then no good faith exception exists.

■ We believe that all these cases are quite fact sensitive, and it is indeed difficult to reason from one to the next. In the present case, the officer described the drug purchases he had personally made and that the individuals resided in two of the three trailers. He described the area as consisting of the three trailers situated in a "U", all at one address and separated by rural fields from any other neighbors or residences. He described seeing a large number of unidentified individuals living in and frequenting the three trailers.

We find that the officers executing the warrant issued by a neutral and detached

magistrate could reasonably believe that probable cause to search a conclave consisting of the three trailers and accumulated junk cars located at a particular address had been established through the indicia presented by Officer McFarland's personal experiences and observations.

We therefore affirm the trial court's denial of the motion to suppress.

BARTEAU, J., concurs.

STATON, J., dissents with separate opinion.

STATON, Judge, dissenting

I dissent. Although I fully agree with the majority's analysis regarding the lack of probable cause supporting the search warrant, I do not agree that the good faith exception announced in *Leon* prevents the suppression of the evidence seized at Figert's and Green's trailer.

I agree with Figert and Green that the affidavit was so lacking in indicia of probable cause as to render a belief in its existence unreasonable. The majority relies on the following facts in concluding that the police were justified in believing probable cause existed to search the third trailer: the trailers were closely situated at one address; there were a number of unidentified individuals around the trailers; the trailers were in a rural area; and drug purchases were made from residents of the first and second trailers. First, it has been clear since *Thompson v. State* that a single street number does not justify entry into separate residences at that address. *Thompson*, 154 N.E. at 279. Second, that there were "unidentified individuals" around the Farm lacks any inferential value whatsoever on the issue of probable cause.

Third, drug purchases from residents of the first and second trailers logically establishes only that: the drug dealers live in the first two trailers, or more significantly for this appeal, the dealers do not live in the third trailer. "Officers must have a reasonable knowledge of what the law prohibits." *Woods*, 514 N.E.2d at 1282. "The principle that a logical connection must be shown between the items to be seized and the place to be searched so as to establish probable cause is a basic concept within the reasonable knowledge of a police officer. This is a core concept of criminal jurisprudence which is found in both case law and statute." *Stabenow v. State*, 495 N.E.2d 197, 202 (Ind.Ct. App.1986). That the drug dealers lived in the first two trailers logically implicates only those two residences.

Fourth, I attribute no weight to the fact that the trailers are in a rural area. If the case law addressing searches of multiunit dwellings stands for any proposition, it is this: criminal activity by a suspect, without more, does not justify entry into the separate residences of the suspect's neighbors, no matter how closely situated to the suspect's residence the neighbors may be. I cannot agree that this proposition should be of less force in a rural setting, especially in a rural state such as Indiana.

Finally, as noted by the Majority, any inference of communal drug trafficking is undermined by the fact that on one occasion the drug purchase was removed from the Farm since the dealer's parents were home at the time.

The good faith exception holds police to an *objective* standard of reasonableness, as it must for the Fourth Amendment to have meaning. *Leon*, 468 U.S. at 922. Viewing the above facts objectively, I do not agree that the police in this case could have reasonably relied upon the affidavit. I acknowledge that the good faith exception will necessarily only apply in situations where there is less than probable cause. Nevertheless, the Fourth Amendment still commands that there be more than a mere suspicion to justify a search. *Woods*, 514 N.E.2d at 1280. A mere suspicion is all that is established by the probable cause affidavit with respect to the third trailer. That the police may have misunderstood the law in this area or attached greater significance to the facts in the affidavit than is otherwise warranted is of no moment in our analysis. The good faith exception should not be utilized in such a manner that State police action becomes a *fait accompli.*

1322

Drugs are clearly high on the public's list of evils to be aggressively eradicated. Police and other public officials have responded to the public's wishes accordingly. These public officials engaged in the competitive enterprise of ferreting out drugs may not, due to their commitment and zeal, always operate in a detached and unbiased manner. The public fervor over drugs can color perception and urge the turning of one's head to invasions of privacy in the interest of pursuing a legitimate and popular end. When free people find themselves in this type of environment, the judiciary would be wise to pay particular attention to the admonishments of our forefathers as expressed through the commands of the Fourth Amendment.

I doubt anyone's sense of justice is offended by the fate awaiting Figert and Green. However, we not only decide cases, but we also set precedent and establish law which directly impacts the lives of over five million Hoosiers. Should the day come when an innocent citizen's door is opened to the State because the citizen lives in close proximity to a drug dealer who has "unidentified individuals" in and around the property, there may well be a collective pause to contemplate how we arrived at such a state of affairs. I fear we may have taken a step in that direction today. I would reverse.